[No. 54277-0-I.   Division One.   December 12, 2005.]

TWIN BRIDGE MARINE PARK, L.L.C., ET AL., *Respondents*, v. THE DEPARTMENT OF ECOLOGY, *Appellant*.

*Robert M. McKenna, Attorney General,* and *Thomas J. Young, Assistant,* for appellant.

*Craig D. Magnusson* and *J. Todd Henry* (of *Oles Morrison Rinker & Baker, L.L.P.*), for respondents.

¶1 COLEMAN, J. —The Department of Ecology (Ecology) appeals a superior court order dismissing penalties imposed by Ecology on Twin Bridge Marine Park (Twin Bridge). Ecology argues on appeal that the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW, grants Ecology broad authority to enforce the SMA, including the authority to impose penalties for shoreline development that violates the SMA. Ecology further argues that Twin Bridge constructed a marina without a necessary shoreline permit, that existing shoreline permits did not authorize its activities, that the development violated the SMA, and that building permits issued by Skagit County (County) for the development do not bar Ecology's enforcement actions. We affirm.

¶2 When the County issued and later reinstated the building permits for Twin Bridge, it necessarily determined that the marina project was consistent with the existing shoreline permits and that the project did not require another shoreline permit. Under the reasoning of our Supreme Court's decision in *Samuel's Furniture, Inc. v. Department of Ecology,* 147 Wn.2d 440, 54 P.3d 1194, 63 P.3d 764 (2002), Ecology was required to appeal the County's determination through a Land Use Petition Act (LUPA), chapter 36.70C RCW, challenge in order to establish its jurisdiction to impose penalties on Twin Bridge. In addition, the resumption of construction work by Twin Bridge before its acquisition of a shoreline permit did not violate a stipulation and

agreed order of dismissal between Twin Bridge and Ecology, as the language of the stipulation and agreed order did not require Twin Bridge to obtain a shoreline permit before resuming work.

## FACTS

¶3 Twin Bridge owns a triangular piece of property in Skagit County near Swinomish Channel. Ken Youngsman, Twin Bridge's predecessor in interest, bought the land in the 1970s with plans to develop the property as a base of operations for his marine construction and dredging business. The development called for mooring dredges, dredge tenders, and other vessels used in the business in a moorage basin, and storing materials and equipment on the upland portions of the site. Youngsman also planned for two buildings: an office building of less than 1,000 square feet, and one repair/storage building of approximately 4,000 square feet. An environmental review was conducted of Youngsman's proposed actions on the site in a 1975 Final Environmental Impact Statement (FEIS).

¶4 Youngsman obtained two shoreline substantial development/conditional use permits from the County. Permit 7-82 allowed for the "placement of about 90,000 yards of landfill, construction and operation of a marine dredging and construction business and the storage of construction materials and equipment." Ecology wrote to the County and Youngsman to say,

> It is our understanding that this permit only authorizes 90,000 cubic yards of fill to be placed on site and subsequent use of the site for the operation of a marine construction and dredging business to include storage of materials and equipment. Any other substantial development on the site such as buildings, shore structures, hard surfacing, and drainage improvements will be submitted as a new permit or a revision to this permit pursuant to WAC 173-14-064.[1]

---

[1] The other permit, Permit 15-86, allowed for the hydraulic dredging of about 40,000 cubic yards of material with upland disposal on site for the creation of a boat basin.

Youngsman later obtained a revision to one of the two permits.

¶5 Youngsman made plans for a more ambitious development of his property as a marina. The development would consist of a dry-stack storage facility with a capacity of about 350 recreational boats, a reinforced concrete pad for lowering boats into the lagoon, a second building for office and retail operations, a large forklift for moving boats from the storage building to the lagoon and for lowering boats from the reinforced concrete pad, boat washing facilities, septic pump-out equipment, fuel dispensing, and paving and drainage improvements. The County issued an FEIS Addendum modifying the 1975 FEIS and determining that the "revision is 'insignificant' and does not have a probable significant adverse impact on the environment." The County also issued two amended building permits for the project.[2] The first building permit allowed for the construction of a building approximately 58,000 square feet in size. Ecology did not receive official notice of the building permits but learned informally of them. The city of Anacortes appealed the issuance of the building permits under LUPA, but Ecology did not.

¶6 When construction under the building permits began, Ecology issued a notice of correction to Twin Bridge. The notice requested Twin Bridge to stop work at the site and obtain a new shoreline permit for use of the site as a marina and for the structures and site work placed within the shoreline. Twin Bridge did not stop work, and Ecology issued its first administrative order and penalty. The order required Twin Bridge to stop work, obtain a new shoreline permit, and pay a penalty of $17,000. Twin Bridge appealed to the Shorelines Hearings Board (Board). At about the same time, the County hearing examiner suspended the two building permits on the ground that the project re-

---

[2] Twin Bridge originally obtained three building permits, but changed its plans soon after issuance and decided to build two larger buildings instead of the three buildings. The County amended the first two building permits to reflect these changes.

quired a new shoreline substantial development/conditional use permit. Twin Bridge stopped work, with exceptions for safety reasons. Twin Bridge applied under protest for a new shoreline permit authorizing use of the site as a marina with buildings with related improvements. Ecology and Twin Bridge reached a settlement agreement. The agreement provided:

1. Ecology hereby withdraws its Penalty Order No. OOSEANR-1209 issued to Ken Youngsman on or about June 21, 2000, subject to the following conditions:

   a. Mr. Youngsman shall continue to pursue in good faith his application for a new Shoreline Substantial Development Permit for the Twin Bridge Marine Park.

   b. In the event that Skagit County issues a Substantial Development Permit to Mr. Youngsman or his associates, Ecology reserves the right to appeal the permit to the Shorelines Hearings Board and to raise any issue therein.

   c. Mr. Youngsman, his associates, and contractors shall not resume work on the site until all required federal, state, and local permits have been obtained.

2. Mr. Youngsman hereby dismisses his appeal in this matter.

¶7 Twin Bridge reached a separate agreement with the County and the city of Anacortes, and the County gave approval to Twin Bridge to continue the work authorized under the two building permits. The County sent a copy of the agreement to Ecology. Ecology did not file a LUPA petition appealing the reinstatement of the building permits. Twin Bridge resumed construction on the site. The County had not finished processing Twin Bridge's application for a new shoreline permit. Ecology issued a second administrative order and penalty requiring Twin Bridge to stop work, reinstated the earlier penalty of $17,000, and added another $17,000 penalty. Twin Bridge completed construction of the two buildings. It received approval for occupancy from the County and opened for business as a marina. Ecology issued its third order and notice of penalty, assessing an additional penalty of $25,000 and ordering

Twin Bridge to cease construction and operations until shoreline permits authorizing the construction and use were obtained. Twin Bridge appealed the second and third orders and notices of penalty to the Board.

¶8 The Board found that the reinforced concrete pad, several boat washing areas, utility lines, a septic tank, an oil-water separator, asphalt parking spaces and much of the paving were located within 200 feet of the moorage basin. The Board also found that improvements outside the 200-foot zone, including the boat storage building and a building for offices and retail/repair operations, gas tanks, a bioswale system, and several septic tanks were directly linked to construction within the 200-foot zone. The Board additionally made this finding of fact: "Skagit County apparently concluded the existing CUP (conditional use permit) 7-82 covered the shoreline aspects of the project since Mr. Youngsman was not required to obtain a revision or seek a new shoreline substantial development permit or conditional use permit."

¶9 The Board ruled that many of the improvements within 200 feet of the moorage lagoon were substantial developments under the SMA, were not authorized by the substantial development/conditional use permits, and were undertaken without a required shoreline permit in violation of RCW 90.58.140. The Board further ruled that the improvements inside and outside the 200-foot zone constituted a single integrated project and that Twin Bridge should have obtained a shoreline permit for the shoreline portions of the project before constructing the upland components of the design. The Board additionally ruled that Twin Bridge violated its settlement agreement with Ecology when it resumed development without acquiring a new shoreline permit. Furthermore, the Board ruled that Ecology's decision not to appeal the building permits under LUPA did not prohibit Ecology from issuing a shoreline enforcement order for Twin Bridge's construction and op-

eration of the marina.[3] The Board finally ruled that Ecology had consistently taken the position that the marina required new shoreline permits and that reliance on the County's building permits did not give rise to relief for Twin Bridge. The Board affirmed Ecology's orders and notices of penalty for a total penalty of $59,000.

¶10 The Washington Supreme Court issued its decision in *Samuel's Furniture, Inc. v. Department of Ecology*, 147 Wn.2d 440, 54 P.3d 1194, 63 P.3d 764 (2002). Twin Bridge moved the Board to vacate its decision in light of *Samuel's Furniture,* but the Board denied the motion.[4]

¶11 Twin Bridge appealed the Board's decision to the Skagit County Superior Court. It asked the court to take as additional evidence the newly issued shoreline substantial development permit. The court granted the motion. It issued its own findings of fact and conclusions of law, and it reversed the Board. In finding of fact 5, the court found that by its issuance of the two building permits and the FEIS Addendum, the County authorized construction of the marina and decided, "[T]he two then-existing Shoreline Substantial Development Permits on that property were adequate to allow the approved construction." In finding of fact 18, the court found that the County's approval "of the requested Shoreline Substantial Development Permit does not include nor require a Shoreline Conditional Use Permit for the marina and associated uses." The court ruled that because WAC 173-27-140 prohibited local jurisdictions from authorizing shoreline development inconsistent with the SMA, the County's issuance of the building permits required a determination that the project "was encompassed

---

[3] The Board made its decision on July 17, 2002. At that time, the Court of Appeals had ruled in *Samuel's Furniture, Inc. v. Department of Ecology*, 105 Wn. App. 278, 19 P.3d 474 (2001), but the Washington Supreme Court had not issued its *Samuel's Furniture* decision reversing the Court of Appeals. Under the Court of Appeals decision, Ecology would not have been required to make a LUPA challenge.

[4] In the meantime, the County issued a shoreline substantial development permit. The project is now completed and approved, and the only outstanding issues are the penalties assessed by Ecology and appealed by Twin Bridge.

by the existing Shoreline Substantial Development Per
mits." The court further ruled that Ecology's failure to file a
timely LUPA challenge to the reissuance of the building
permits vested Twin Bridge's rights in those permits and
precluded Ecology from making a collateral attack on
activities authorized by the building permits. The court
additionally ruled that Ecology's orders were impermissible
collateral attacks, made without jurisdiction. The court
held that the orders must be dismissed and that the Board's
decision must be reversed. Ecology appealed.

## ANALYSIS

¶12 We begin by analyzing whether Ecology was re-
quired to file a LUPA petition challenging the building
permits issued by the County for Twin Bridge's marina
project before imposing penalties on Twin Bridge for the
development.[5] Ecology argues that it imposed penalties on
Twin Bridge under a grant of broad enforcement authority
to it by the SMA. Twin Bridge argues that the superior
court correctly ruled that the reasoning of *Samuel's Furni-
ture* applies to this dispute and that LUPA required Ecology
to appeal the building permits. Ecology contends that the
superior court should have limited *Samuel's Furniture* to
its jurisdictional holding and that LUPA does not limit its
enforcement authority.

¶13 In *Samuel's Furniture*, our Supreme Court held that
Ecology is required to file a timely LUPA petition to
challenge a local government's decision to allow a develop-
ment project when the local government has determined
that the project is not within the shoreline jurisdiction.
*Samuel's Furniture*, 147 Wn.2d at 444. The city of Ferndale
(City), which was the local government with the authority
to issue permits, had determined that Samuel's Furniture

---

[5] In reviewing an administrative decision, an appellate court stands in the same
position as the Superior Court. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141
Wn.2d 169, 176, 4 P.3d 123 (2000). An appellate court reviews the agency's factual
findings under the substantial evidence standard and conclusions of law de novo.
*Wenatchee Sportsmen*, 141 Wn.2d at 176.

did not need to obtain a shoreline permit for an extension to its store because the extension was not in the shoreline jurisdiction. *Samuel's Furniture*, 147 Wn.2d at 444. The City issued a fill and grade permit and a building permit for the extension. *Samuel's Furniture*, 147 Wn.2d at 444. Ecology asserted that the extension was within the shoreline jurisdiction and that construction could not proceed without a shoreline substantial development permit. *Samuel's Furniture*, 147 Wn.2d at 445. The City issued a stop-work order but then determined after reviewing its Shoreline Management Program and shoreline jurisdiction map that the extension was not in the shoreline jurisdiction and withdrew the stop-work order. *Samuel's Furniture*, 147 Wn.2d at 445. Ecology maintained that the project was within the shoreline jurisdiction and informed Samuel's Furniture that it would be unable to obtain a shoreline substantial development permit because the area would be considered a conservancy shoreline environment. *Samuel's Furniture*, 147 Wn.2d at 445-46. Samuel's Furniture sought declaratory relief in Superior Court. *Samuel's Furniture*, 147 Wn.2d at 446. The Washington Supreme Court ultimately ruled that Ecology could not penalize Samuel's Furniture because it failed to challenge through a LUPA petition the City's decisions to issue the fill and grade or building permits and to withdraw the stop-work order. *Samuel's Furniture*, 147 Wn.2d at 448.

¶14 Ecology urges this court to limit *Samuel's Furniture* to situations in which a local government has determined that a project is not within the shoreline jurisdiction, which was the precise issue before the Supreme Court. Because no one disputes that Twin Bridge's marina project falls within the shoreline jurisdiction, Ecology argues that it has the authority to enforce the SMA without appealing the County's issuance of the building permits through a LUPA petition.

¶15 Twin Bridge argues, however, that the reasoning of *Samuel's Furniture* applies to this dispute and that it requires Ecology to file a LUPA petition challenging the

issuance of permits when the issuance represents a decision by the local government that the development is consistent with already existing shoreline permits and that a further shoreline development permit is not required. Ecology's authority to enforce provisions of the SMA includes (1) its authority to review and approve or disapprove variance and conditional use permits; (2) its ability to appeal a decision granting, denying, or rescinding a shoreline substantial development permit to the Board; and (3) its authority to issue penalties if a party fails to conform to the terms of a permit issued under the SMA or undertakes shoreline development without obtaining a permit required under the SMA. RCW 90.58.140(10), .180(2), .210(2), (3). But the administration of the permit system " 'shall be performed exclusively by the local government.' " *Samuel's Furniture*, 147 Wn.2d at 448 (quoting RCW 90.58.140(3)). A local government's exclusive authority to administer the permit system necessarily means that the local government has the authority to determine that a shoreline project is consistent with already existing shoreline permits and that further shoreline permits are not necessary.

¶16 Twin Bridge further argues that the County made the determination that its development was consistent with the County's shoreline master plan and Twin Bridge's existing shoreline permits when it issued the two building permits. The *Samuel's Furniture* court noted that WAC 173--27-140 prohibits local governments from authorizing development on shorelines unless it is consistent with the " 'policy and provisions of the [SMA] and the master program.' " *Samuel's Furniture*, 147 Wn.2d at 450 (alteration in original) (quoting WAC 173-27-140). In the dispute between Samuel's Furniture and Ecology, the court ruled that because WAC 173-27-140 prohibits local governments from authorizing shoreline development inconsistent with the SMA, a local government's issuance of fill and grade and building permits "necessarily required a determination that the project was outside the shoreline jurisdiction." *Samuel's Furniture*, 147 Wn.2d at 451. If Ecology dis-

agreed, it could have challenged the issuance of those permits under RCW 36.70C.130(1)(b) (erroneous interpretation of the law) or RCW 36.70C.130(1)(d) (clearly erroneous application of the law to the facts). *Samuel's Furniture*, 147 Wn.2d at 451.

¶17 The court further stated that the grant of enforcement authority to Ecology under RCW 90.58.210 does not enable Ecology "to reverse local government decisions." *Samuel's Furniture*, 147 Wn.2d at 456. If Ecology had such authority, it would not need to appeal permit decisions to the Board under RCW 90.58.180(2) and would no longer share enforcement authority with local governments. *Samuel's Furniture*, 147 Wn.2d at 456. "Using RCW 90-.58.210 to collaterally attack a local government decision would be at odds with the policy of cooperation encompassed in RCW 90.58.050." *Samuel's Furniture*, 147 Wn.2d at 456. Requiring Ecology to file a LUPA petition to contest a local government's decision to allow a land use action would also serve the State's " 'strong public policy favoring administrative finality in land use decisions.' " *Samuel's Furniture*, 147 Wn.2d at 458 (quoting *Skamania County v. Columbia River Gorge Comm'n*, 144 Wn.2d 30, 48, 26 P.3d 241 (2001)). Blanket enforcement authority by Ecology would conflict with the public policy favoring administrative finality, as a developer could be subject to enforcement by Ecology while relying in good faith on a local government's determination. *Samuel's Furniture*, 147 Wn.2d at 458.

¶18 The Supreme Court's analysis in *Samuel's Furniture* is equally applicable here. As the trial judge stated in her well-reasoned letter opinion:

> I am unable to distinguish this case from *Samuel's* in any meaningful way. The challenged decision is a land use decision by a local government. It is a final decision appealable under LUPA. It is not exempt from LUPA. And requiring Ecology to pursue the issue through a LUPA appeal satisfies the same policy considerations outlined in *Samuel's*.

We agree. There is nothing in the majority's reasoning that would permit limiting the reach of the court's holding to a local government's decision that a project was not within shoreline jurisdiction. Our holding does not extend *Samuel's Furniture*; we merely apply, as we must, its reasoning to the case at hand. Because WAC 173-27-140 prohibits a local government from authorizing shoreline development unless it is consistent with the SMA and the local government's shoreline master program, the issuance of the building permits necessarily required a determination by the County that Twin Bridge's new plans were consistent with the already existing shoreline permits. Both the Board and the Superior Court found that the County decided that the existing shoreline permits covered the shoreline aspects of Twin Bridge's marina project.

¶19 As the *Samuel's Furniture* court ruled, local governments such as the County are the exclusive administrators of the shoreline permitting process. Furthermore, public policy favors administrative finality in land use decisions.[6] Developers such as Twin Bridge must be able to act in good faith on permits issued by local governments without concern that Ecology will later impose penalties under RCW 90.58.210.

¶20 Ecology disagreed with the County's determination that the existing shoreline permits encompassed Twin Bridge's marina. On this record, we know that Ecology made its position known early to the County and to Twin Bridge, that the County knew Ecology's stance, and that the County decided differently. But *Samuel's Furniture* limits Ecology's oversight and independent enforcement role when a local government has determined that a devel-

---

[6] The dissent attempts to distinguish *Samuel's Furniture* by reasoning that because Ecology had to approve the conditional use permits, it had the authority to enforce them according to its own interpretation of their scope. This approach, however, ignores the issue—Ecology is telling the developer that the conditional use permits do not authorize the proposed development and that they must obtain a new substantial development permit and the permitting authority (Skagit County) is telling the developer that a new substantial development permit is unnecessary. These contradictory positions create the same problems articulated by the Supreme Court in *Samuel's Furniture*.

opment is consistent with the SMA. Under the analysis of *Samuel's Furniture*, Ecology must invoke LUPA to challenge a permit that it believes is inconsistent with the SMA, or it must enlist the aid of the local government. An inferential decision by the local government that an additional shoreline permit is not required must be appealed through LUPA to the superior court.[7] Directly imposing a penalty through RCW 90.58.210 would constitute a collateral attack on a local government decision at odds with the policy of cooperation contemplated in RCW 90.58.050.

¶21 Ecology also argues that Twin Bridge violated the stipulation and agreed order of dismissal and that this violation constitutes an independent basis for affirming Ecology's penalties. The stipulated and agreed order of dismissal, resulting from a settlement agreement between Ecology and Twin Bridge of Twin Bridge's appeal of Ecology's initial penalty, required Youngsman to continue to pursue in good faith his application for a new shoreline substantial development permit and to refrain from resuming work until Twin Bridge had obtained "all required federal, state, and local permits." But Twin Bridge did not violate this agreement by resuming work before it had acquired a new shoreline permit. By issuing the building permits, Skagit County made the inferential decision that Twin Bridge did not need to obtain a new shoreline permit. The County reaffirmed this decision a second time when it reached a settlement with the city of Anacortes and approved a resumption of work under the building permits. Thus, Twin Bridge had all the necessary permits. The agreement required Twin Bridge to continue pursuing its application for a new shoreline permit, which it did, but the

[7] Ecology contends that it has explicit authority to impose penalties under RCW 90.58.210(2), (3), that nothing in the SMA suggests that Ecology must file a LUPA petition to challenge a building permit and that the legislature did not intend to amend the SMA when it enacted LUPA. But *Samuel's Furniture* indicates that Ecology does not have the broad independent oversight role that it believed it had. We are sympathetic to the responsibility of Ecology to act "in a supportive and review capacity with an emphasis on providing assistance to local government and on insuring compliance with the policy and provisions of this chapter." RCW 90.58.050. But in light of *Samuel's Furniture*, it may be necessary for Ecology to seek legislative changes so that it might have greater oversight authority.

clear language of the agreement did not bar Twin Bridge under these circumstances from resuming construction work before it obtained the shoreline permit. Twin Bridge therefore did not violate the stipulation and agreed order of dismissal.

¶22 In conclusion, we affirm the decision of the Superior Court reversing the Board's order and dismissing Ecology's penalties and orders.

AGID, J., concurs.

¶23 BECKER, J. (dissenting) — The history of the Twin Bridge Marine Park (Twin Bridge) project establishes that it was subject to the Department of Ecology's (Ecology) authority over shoreline conditional use permits. Accordingly, I respectfully dissent from the majority's conclusion that the outcome of this case is controlled by *Samuel's Furniture, Inc. v. Department of Ecology*, 147 Wn.2d 440, 54 P.3d 1194 (2002).

¶24 Twin Bridge obtained two substantial development/ conditional use permits from Skagit County (County) in the 1980's. The permits, #7-82 and #15-86, authorized use of the site for placement of landfill, operation of a marine construction and dredging business, and creation of a boat basin in which to moor the construction and dredging equipment.

¶25 Ecology has direct authority over shoreline conditional use permits. "Any permit for a variance or a conditional use by local government under approved master programs must be submitted to the department for its approval or disapproval." RCW 90.58.140(10). Ecology may attach special conditions to a conditional use permit "to prevent undesirable effects of the proposed use and/or to assure consistency of the project with the act and the local master program." WAC 173-27-160. Ecology may penalize violations of these permits "jointly with local government," or alone. WAC 173-27-280(1).

¶26 After reviewing each of the two permits, Ecology approved of them as meeting the intent of the master program and the criteria set forth in the Washington Administrative Code for granting a conditional use.[8] Ecology repeatedly emphasized that approval was for the designated uses only. For instance, Ecology informed Twin Bridge:

> It is our understanding that this permit only authorizes 90,000 cubic yards of fill to be placed on site and subsequent use of the site for the operation of a marine construction and dredging business to include storage of materials and equipment. Any other substantial development on the site such as buildings, shore structures, hard surfacing, and drainage improvements will be submitted as a new permit or a revision to this permit.[9]

¶27 Twin Bridge carried out the site development authorized by these conditional use permits, although delay was occasioned by litigation with the State Department of Fish and Wildlife (Fish and Wildlife) over the necessary hydraulic permit. In 1998 Ecology approved a revision to permit #15-86 to authorize a redesign of the moorage basin agreed to by Fish and Wildlife, subject to three additional conditions. Condition 3 of Ecology's approval was that "All *uses* and *activities* not *specifically* authorized in Permits #SHL 7-82 and 15-86 are prohibited."[10]

¶28 Twin Bridge began to plan further development of the site as a backshore marina. The main structure was to be outside the shoreline jurisdiction, that is to say more than 200 feet from the shore. *See* RCW 90.58.030(2)(f). But within the shoreline jurisdiction there would be appurtenant structures, hard surfacing, and drainage improvements. Twin Bridge applied to the County in 1999 for

---

[8] Ex. R-4, R-9 (Department's Exhibits from Shoreline Hearing Board proceedings).

[9] Ex. R-4.

[10] Ex. R-23.

building permits. The County issued two building permits on March 7, 2000.[11]

¶29 Twin Bridge began construction. Ecology issued a Notice of Correction on May 1, 2000, advising that the new use and structures exceeded the scope of the conditional use permits as approved by Ecology.[12] Twin Bridge wrote to Ecology on May 22, 2000, urging that the new construction should be seen as complying with permits #7-82 and #15-86. The letter asserts that the current construction activities within the shorelines were "controlled by" and implicitly authorized by the existing conditional use permits.[13] Ecology, adhering to its position that the new development was not "within the scope or intent" of the original conditional use permits, issued a stop-work order on June 21, 2000.[14]

¶30 On the same day, the Skagit County Hearing Examiner decided—apparently in response to an appeal of the building permits brought by the city of Anacortes—that a new shoreline substantial development/conditional use permit was required for the proposed development. Enforcing the Hearing Examiner's decision, the County issued its own stop-work order, along with a notice of suspension of the building permits, on June 27, 2000.[15] Twin Bridge stopped work, and submitted an application on July 1, 2000, for a new substantial development/conditional use permit "under protest" of Ecology's stop-work order.[16]

¶31 Also, Twin Bridge apparently appealed the Hearing Examiner's decision to the county commissioners. On February 9, 2001, unknown to Ecology (Ecology had not been a participant in the Anacortes appeal of the building permits), Twin Bridge resolved its appeal by signing a settlement agreement with Anacortes and the County. The settle-

---

[11] Ex. R-41.

[12] Ex. R-46.

[13] Ex. R-47.

[14] Ex. R-50 (Allegation of Law 20).

[15] Ex. R-52.

[16] Ex. R-53.

ment agreement and other materials relating to the Anacortes appeal are not in our record, but Ecology acknowledges that the settlement vacated the hearing examiner's decision that a new shoreline permit was required.[17] On February 12, 2001, citing the authority of the settlement agreement, the County lifted its notice of suspension of the building permits and authorized work to begin in compliance with the building permits.[18]

¶32 Meanwhile, Twin Bridge was in the process of obtaining Ecology's agreement to withdraw the penalty on condition that Twin Bridge would "continue to pursue in good faith" its application for a new substantial development permit and not resume work until "all required" permits had been obtained.[19] A stipulation to this effect, and an agreed order of dismissal of the Twin Bridge's appeal of the penalty order to the Shoreline Hearings Board, was approved by the Board on February 16, 2001. Notwithstanding this agreement, Twin Bridge immediately resumed work on the project—thus provoking further penalty orders from Ecology and giving rise to the present dispute.

¶33 The majority concludes that Twin Bridge's resumption of work did not justify enforcement action by Ecology because the County's reinstatement of the building permits implicitly decided that further shoreline permits were not required, and Ecology must now accept that implicit decision as correct because Ecology failed to challenge it in a timely manner under the Land Use Petition Act, chapter 36.70C RCW.[20] The majority finds this result compelled by *Samuel's Furniture, Inc. v. Department of Ecology*, 147 Wn.2d 440, 54 P.3d 1194 (2002). The majority reasons that Twin Bridge, like the developer in *Samuel's Furniture*, was entitled to act in good faith on the building permits issued

---

[17] Br. of Appellant at 10 n.6.

[18] Ex. A-2.

[19] Ex. R-80.

[20] Majority at 743.

by the local government, without concern that Ecology would later impose penalties.

¶34 But Twin Bridge is not like the developer in *Samuel's Furniture*. Unlike that developer, Twin Bridge was subject to conditional use permits previously approved by Ecology for activity on the site. As shown by its letter of May 22, 2000, Twin Bridge took the position that the expansion of the project from a moorage basin and dredging business into a backshore marina was within the scope of those conditional use permits.[21] Ecology consistently maintained the opposite—that the scope of the permits was limited to the uses and activities they specifically designated. By reinstating the building permits, the County implicitly sided with Twin Bridge and decided that the new activities were within the scope of the old permits. The issue presented now is whether that decision was exclusively the County's to make or whether the Shoreline Management Act of 1971, chapter 90.58 RCW, authorizes Ecology to enforce its own interpretation of the conditional use permits, even if it differs from the County's.

¶35 The Shoreline Management Act does not give Ecology the right to directly review a local government's decision regarding a substantial development permit. *Samuel's Furniture*, 147 Wn.2d at 455. However, as the court noted in *Samuel's Furniture*, the act does give Ecology the responsibility of reviewing conditional use permits for approval. RCW 90.58.140(10); *see Samuel's Furniture*, 147 Wn.2d at 455 n.13. This distinction is key. A shoreline conditional use permit issued by a local government is not valid except as approved by Ecology. In deciding to approve the original conditional use permits, Ecology clearly stated that the approval was subject to the understanding that the permits did not authorize uses and activities on the site not specifically designated in the permits. If Twin Bridge was dissatisfied with Ecology's limitations on the scope of the permits, Twin Bridge should have said so at the time or used the

---

[21] Ex. R-47.

appeal process in the Shoreline Management Act to challenge them. Because Twin Bridge accepted Ecology's limitations without challenge, development of the property was subject to the limited scope of conditional use permits as Ecology consistently interpreted them.

¶36 I would hold that Ecology has authority to enforce the conditional use permits according to its own interpretation of their scope. As the majority concludes, the Shoreline Hearings Board was in error to conclude that Ecology could penalize Twin Bridge for proceeding without a required substantial development permit; the County had exclusive authority to decide whether such a permit was required and its decision will stand because Ecology did not appeal it.[22] However, we may affirm on any ground sufficiently developed before the Board. I would affirm on the basis that Ecology could penalize Twin Bridge for expanding its existing business as if the new uses and structures were authorized by the existing conditional use permit, when Ecology—using its independent authority—had decided they were not. *Samuel's Furniture* does not deprive Ecology of that authority.

¶37 It is an unwarranted extension of *Samuel's Furniture* to require Ecology to first challenge the County's issuance of the building permits in superior court as if only a local land use decision were involved. The Shoreline Management Act, referred to and approved by a vote of the people, is intended to "prevent the inherent harm in an uncoordinated and piecemeal development of the state's shorelines." RCW 90.58.020. Ecology's independent authority to penalize violations of conditional use permits is a significant part of the enforcement mechanism set forth in the act, and nothing in *Samuel's Furniture* allows it to be undermined. The Shoreline Hearings Board's decision to affirm the penalties issued by Ecology should be affirmed.

---

[22] Majority at 743-44.